# Illinois Official Reports

## Appellate Court

*People v. Bennett*, 2017 IL App (1st) 151619

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ANGELO BENNETT, Defendant-Appellant. |
| District & No. | First District, First Division<br>Docket No. 1-15-1619 |
| Rule 23 order filed<br>Motion to publish allowed<br>Opinion filed | October 30, 2017<br><br>November 28, 2017<br>December 11, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 13-CR-1260001; the Hon. Carol M. Howard, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Almanza Law LLC, of Chicago (Mark Almanza, of counsel), for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Douglas P. Harvath, and Tasha-Marie Kelly, Assistant State's Attorneys, of counsel), for the People. |

JUSTICE HARRIS delivered the judgment of the court, with opinion.
Justices Simon and Mikva concurred in the judgment and opinion.


**OPINION**

¶ 1     Following a bench trial, the trial court found defendant-appellant, Angelo Bennett, guilty of first degree murder in the shooting death of Charles Jones and guilty of attempted first degree murder in the shooting of Kathy Bias. The trial court also made a finding that defendant used a firearm in the commission of both crimes. The trial court sentenced defendant to 45 years for the first degree murder with the firearm enhancement and 31 years for the attempted murder with the firearm enhancement. Defendant's posttrial motions were denied and this timely appeal followed.

¶ 2     Defendant raises three issues on appeal. Defendant argues (1) the trial court erred in rejecting his claim of self-defense, (2) the trial court erred when it did not reduce his convictions because of the presence of mitigating factors, and (3) his trial counsel was ineffective for failing to successfully argue for either the affirmative defense of self-defense or the presence of mitigating factors.

¶ 3     Based on the record before this court, we find no errors with the proceeding before the trial court and affirm defendant's convictions for first degree murder and attempted first degree murder.


¶ 4                                    JURISDICTION

¶ 5     On March 31, 2015, a trial judge found defendant guilty of first degree murder in the death of Charles Jones and guilty of attempted first degree murder for shooting Kathy Bias. On May 27, 2015, defendant moved for a new trial, which the trial court denied. The trial court then sentenced defendant. A notice of appeal was filed on the same day. Accordingly, this court has jurisdiction pursuant to article VI, section 6, of the Illinois Constitution and Illinois Supreme Court Rules 603 and 606, governing appeals from a final judgment of conviction in a criminal case entered below. Ill. Const. 1970, art. VI, § 6; Ill. S. Ct. Rs. 603, 606 (eff. Feb. 6, 2013).


¶ 6                                    BACKGROUND

¶ 7     On May 25, 2013, around 2:00 a.m., the victims, Charles Jones, and his girlfriend, Kathy Bias, were driving in his Maserati around the Goose Island area of Chicago when they collided with another car. Jones pulled over immediately, as did the other car. Jones exited his vehicle and the driver of the other car, who Bias would later identify in court as the defendant, exited his vehicle. There was also a passenger in defendant's car, Efrain Melecio, a longtime friend and staff sergeant in the United States Marine Corps. Melecio remained seated in defendant's vehicle.

¶ 8     Jones walked to the front of his car, saw the damage on the passenger side, and let out an expletive. Melecio observed that Jones was "visibly upset" about the damage to his car. Jones and the defendant began talking to each other, and Bias exited Jones's car, called 911, and walked to the back of defendant's car to get his license plate number. As Bias stood talking

to the police on her phone, defendant jumped back into his car and drove away from the scene. Bias informed the 911 operator that the defendant had just left the scene, but Bias was instructed not to pursue the defendant and instead head to the nearest police station.

¶ 9       In the defendant's car, Melecio told the defendant to let him out because "he did not want to be involved in the situation." Defendant stopped, and both he and Melecio exited the car. Melecio realized he left his phone in the car and asked defendant to unlock it for him. Melecio retrieved his phone. At the same time, defendant grabbed something from his car, walked over to a car parked on the street and placed the object underneath it. Melecio did not see the object. While defendant and Melecio were outside of the car, Jones and Bias pulled up to them.

¶ 10      Jones exited his vehicle and approached the defendant, asking why the defendant had fled the scene. During this exchange, Jones grabbed the defendant and defendant grabbed Jones. Melecio saw Jones begin striking defendant in the head and observed some kind of metallic object in Jones's hand that Melecio believed to be a set of keys. Both Bias and Melecio saw blood coming from defendant's head. At some point, Bias walked behind the defendant and went through his pockets to see if he had any identification.

¶ 11      As the defendant and victim continued to struggle, Melecio walked over to the parked car defendant had approached earlier to see what defendant had placed underneath the vehicle. Melecio observed that it was a silver revolver and left it there. Melecio then told the men to let go of each other or he would call the police. When the pair continued to struggle, Melecio told them they had five seconds to break it up and began counting down from five. The two men stopped and looked at him allowing defendant to break free. Defendant moved toward where he had placed the gun. Jones did not follow him. The defendant bent down, stood back up, and then proceed toward Jones in a manner Bias described as "aggressive." The defendant had his hands behind his back concealing the gun. When defendant was about an arm's length away from Jones, defendant raised the gun and shot Jones. At the time, Bias saw Jones standing with his hands in the air. After the shot, Bias noticed that Jones was "woozy." Jones fell to the ground and defendant shot him again in the face.

¶ 12      After the shots, Bias ran to the Maserati and got in the driver's seat. As Bias attempted to put the car in gear, the defendant came to the passenger window and shot her in the back. Bias managed to shift the car into gear and started driving forward. Defendant got back into his car and directed Melecio to get in, but Melecio refused. Bias reversed and checked on Jones. She called the police, and both she and Jones were transported to the hospital. Jones later died from his gunshot wounds.

¶ 13      Melecio was scheduled to fly to Reno, Nevada, later in the day to meet up with his fiancé before reporting for duty. Before departing Chicago, Melecio called and sent text messages to defendant asking to meet. When they met up, Melecio told the defendant that he needed to turn himself in but the defendant refused. Melecio asked defendant what happened to the gun and defendant informed him that he broke it down into pieces and threw them over a bridge at different locations.

¶ 14      After arriving in Reno, Melecio received a call from attorney John Miraglia, who indicated that he represented the defendant. Melecio and Miraglia spoke briefly about the shooting but Melecio terminated the conversation because it made him uncomfortable. Following the conversation with Miraglia, Melecio called the Chicago police department. Melecio spoke with Detective Robert Garza and informed him that he had witnessed the

shooting. Detective Garza requested that Melecio return to Chicago immediately. Melecio flew back to Chicago and was interviewed by Garza. Melecio told Garza that defendant shot both Jones and Bias.

¶ 15    Defendant was charged with first degree murder in the death of Jones and attempted first degree murder in the shooting of Bias. Defendant proceeded to a bench trial, where the State called both Bias and Melecio. Both Bias and Melecio gave a similar description of events consistent with the above, though their accounts did differ in some respects.

¶ 16    In her testimony, Bias denied seeing any item in Jones's hand during the struggle with defendant but did admit that Jones sometimes carried a knife with him. She denied that immediately following the crash Jones was angry about the damage to his car. She did not see Jones strike the defendant in the head and testified that she observed Jones and defendant "holding" each other. On cross-examination, Bias admitted that she might have told police that Jones and defendant "tussled" for about two minutes, but she denied that Jones had lifted defendant off the ground.

¶ 17    Melecio disagreed with Bias and indicated that Jones struck defendant between 10 to 15 times with a metal object he thought was keys. He told Detective Garza that Jones's attention turned to him at one point and that Jones did look at him but said nothing. He had also told the detective that Jones and Bias were unarmed, that the fight "paused" before defendant went to retrieve the gun, and that he never heard any threats directed toward him. While he told Jones to stop, he took no steps to intervene or help defendant.

¶ 18    The People also offered stipulations that an evidence technician from the Chicago police department recovered blood swabs and a knife handle with red stains; a forensic scientist performed test on the handle and determined that it was blood and subsequently found two profiles in the blood, a major profile from which defendant could not be excluded and a minor profile from which the victim could not be excluded; and the assistant medical examiner determined that the cause of Jones's death was multiple gunshot wounds and the manner of death was homicide. Following these stipulations, the State rested. Defendant moved for a directed verdict, which the trial court denied.

¶ 19    Defendant called John Miraglia, an attorney, who confirmed that on May 29, 2013, he accompanied the defendant to the police station. He identified a photograph of defendant showing an injury to the top of defendant's head.[1] The blood around the injury depicted in the photo was not present when he saw defendant. When he spoke with Melecio by phone, Melecio told Miraglia that he was "afraid" but could not recall if Melecio specifically stated that he feared for his life. Melecio told him that the victim came after "them" and that Melecio specifically used the word "them."

¶ 20    The defendant testified in his own defense. On the night of the accident, he had one drink at a night club before leaving around 2 or 2:30 a.m. with Melecio. As he and Melecio were going over a bridge on Division Street, Jones collided with them. Both of his passenger-side tires popped, and he pulled over to the side of the road. When they stopped, defendant told Melecio to call the police.

---

[1]While the record shows the State entered 34 exhibits into evidence and the defendant entered 1 exhibit, none of the exhibits were contained within the appellate record. Neither party has provided an explanation.

¶ 21    Defendant got out of his car to check on the damage. Defendant told Jones he had his "information" and asked for Jones's but he was talking on the phone, swearing, and ignoring defendant. Jones told defendant to get out of his face and that his car was worth $70,000. Defendant retreated to his car and asked Melecio if he had called police. Melecio indicated to defendant that he had. When defendant saw Bias looking at his license plate, he realized he had a gun in the car and drove from the scene.

¶ 22    As defendant was driving away from the scene, he noticed Jones behind him so he quickly stopped his car, got out, grabbed his gun and placed it under a nearby parked car. Defendant returned and was grabbed by Jones who yelled, "you tried to get away," before pushing defendant up against defendant's car. Jones placed his full body weight on defendant and placed his forearm on defendant's neck. Defendant testified that Jones started hitting him with some kind of metal object on the top of his head, and he did not have a chance to hit back. As he was pinned against the car, Bias was patting him down and going through his pockets. He could not recall how long Jones hit him.

¶ 23    Defendant acknowledged that Melecio got Jones's attention by screaming and knocking on the car. This is when defendant was able to break free. Melecio allegedly yelled "look what you did to my friend," and Jones yelled back that Melecio was next. Melecio started to back away from Jones. Defendant retrieved the gun and told Jones to stop. Defendant placed himself between Jones and Melecio as Jones was "closing in" on Melecio. Defendant pointed the gun at Jones and told him to stop but Jones continued to advance. Defendant fired one shot at Jones. Jones grabbed his mouth but "kept coming" so he fired a second shot. Jones fell to the ground. Defendant denied shooting Bias. He claimed to have only fired two shots, both at Jones.

¶ 24    On cross-examination, defendant admitted that he tried to call 911 after the accident but did not get an answer. After the shooting, defendant threw the gun into a blue garbage can about a half block away from the scene and then hid under a car. After the sirens had ceased, defendant walked about two hours home to his grandmother's house. He then called a tow truck to pick up his car. He took a bus to meet the tow driver and had it towed back to his grandmother's house. After he dropped his car off, he told his grandmother he had to leave. Instead of going back to his apartment, defendant went to a bar open 24-hours a day. He denied telling Melecio what happened to the gun. Defendant admitted that between May 26 and May 28, he did not seek medical care for his injuries. After concluding his testimony, the defendant rested.

¶ 25    The State then recalled Detective Keith Smith. He explained that immediately following the shooting, he and at least 40 other officers, 6 detectives, and an evidence technician spent hours combing the Goose Island area for defendant's car but could not locate it. They also searched nearby garbage cans and dumpsters but could not find the gun.

¶ 26    After closing arguments, the trial court, sitting as the finder of fact, found defendant guilty of first degree murder in the death of Jones and also concluded he personally discharged a firearm proximately causing Jones's death. The court also found him guilty of attempted first degree murder for shooting Bias. It also made a finding that defendant had personally discharged a firearm causing great bodily harm to Bias. The court specifically found Efrain Melecio's testimony to be the most credible because he gave both helpful and hurtful testimony to the defendant, his friend. The court rejected defendant's claim of

self-defense because it found the fight over with when Melecio yelled at the pair to stop and after that point defendant was no longer in immediate danger.

¶ 27   Defendant filed a motion for a new trial, which the trial court denied. At sentencing, the trial court imposed a 20-year sentence for the first degree murder conviction with an additional 25-year sentence for the personal discharge of a firearm. The court also imposed a 6-year sentence for the attempted first degree murder with an additional 25-year sentence for the personal discharge of a firearm.

¶ 28   Defendant timely filed his notice of appeal.

¶ 29                                                    ANALYSIS

¶ 30   Defendant raises three issues on appeal: (1) the trial court erred in rejecting his claim of self-defense, (2) the trial court erred when it did not reduce either of his convictions, and (3) his trial counsel was ineffective for failing to successfully argue for either a finding of self-defense or a reduction to second degree murder.

¶ 31   In his first issue, the defendant argues the trial court erred when it found he did not act in self-defense in the shooting of Jones. Based on his own testimony, he argues he only had seconds to act after breaking free from Jones. Jones had just threatened Melecio and was advancing in his direction. Defendant placed himself in between Jones and Melecio to protect Melecio before firing once. He fired a second time only after Jones continued to advance.

¶ 32   Under Illinois law the affirmative defense of self-defense can be raised only if a defendant presents some evidence as to each of the following elements: "(1) force had been threatened against the defendant; (2) defendant was not the aggressor; (3) the danger of harm is imminent; (4) the force threatened was unlawful; (5) defendant actually believed that a danger existed, that force was necessary to avert the danger, and that the amount of force he used was necessary; and (6) that the beliefs were reasonable." *People v. Willis*, 217 Ill. App. 3d 909, 917 (1991) (citing *People v. Kyles*, 91 Ill. App. 3d 1019 (1980)).

¶ 33   If a defendant presents "some evidence as to each of these elements," the burden shifts to the State to disprove the defense beyond a reasonable doubt. *Id.*; *People v. Estes*, 127 Ill. App. 3d 642, 651 (1984). The State needs only to negate one element listed above in order to defeat a self-defense claim. *People v. Zolidis*, 115 Ill. App. 3d. 669, 674 (1983). Whether or not the testimony and evidence support a self-defense claim is to be determined by the trier of fact. *Estes*, 127 Ill. App. 3d at 651. In this case, the trial court, sitting as the trier of fact, had the duty to resolve conflicts in the evidence and determine the credibility of witnesses. *People v. Perry*, 91 Ill. App. 3d 988, 993 (1980). We will not reverse a trier of fact's conclusions unless the evidence is so improbable or unsatisfactory as to raise a reasonable doubt of guilt. *Zolidis*, 115 Ill. App. 3d at 674.

¶ 34   Without addressing any of the other necessary factors, we reject defendant's argument that trial court erred in determining that he no longer faced an imminent harm. Defendant's argument is premised on reweighing the evidence, rejecting the trial court's factual findings, and substituting his view of the evidence for the trial court's view. *People v. Abdullah*, 220 Ill. App. 3d 687, 693 (1991) (a reviewing court has neither the duty nor the privilege to substitute its judgment for the trier of fact).

¶ 35   Based on the testimony of Bias and Melecio, the trial court concluded that once the fighting between Jones and defendant ceased, Jones no longer represented a threat to either

- 6 -

defendant or Melecio. The trial court, sitting as the finder of fact, specifically found Melecio's testimony to be the most credible.

¶ 36        Both Melecio and Bias gave a similar description of events that contradicted defendant's version. Bias testified that after the fighting stopped, defendant ran five to six cars down from his present location to retrieve the gun. Jones did not pursue the defendant nor threaten defendant at this time. Bias further testified that defendant concealed the weapon behind his back as he approached Jones and only when he got within an arm's length of Jones did he reveal it. Bias alleged that Jones had his hands up when the defendant fired the first shot.

¶ 37        Melecio did not recall what Jones was doing while defendant retrieved the gun, but important for our review, Melecio did not corroborate defendant's version of events. Melecio did not testify that Jones threatened or advanced on him. Melecio did not testify that he retreated from Jones nor did he testify that defendant stepped in between him and Jones. Moreover, unlike defendant's version, both Melecio and Bias testified that Jones did not advance on defendant but fell to the ground following the first shot. Bias testified that the second shot occurred while Jones was on the ground.

¶ 38        In arguing for reversal, defendant relies on *People v. Williams*, 56 Ill. App. 2d 159 (1965), and *People v. Shipp*, 52 Ill. App. 3d 470 (1977). In *Williams*, the defendant was confronted by a gang of young men, whom defendant had just seen beating an elderly man. 56 Ill. App. 2d at 167-69. Moments before defendant discharged his weapon, the group threw a cement block or brick at defendant and advanced toward his location. *Id.* at 163. Defendant's account was then corroborated by another witness at trial. *Id.* Furthermore, it was stipulated that the elderly victim would have testified that the defendant saved his life. *Id.* at 168. Here, defendant faced a single individual, who the finder of fact concluded was not advancing toward the defendant and no longer represented a threat to defendant. Defendant's friend did not corroborate defendant's version of events or testify that defendant's actions saved his life.

¶ 39        In *Shipp*, the victim and defendant were a former husband and wife with the husband having a long history of violence toward the defendant-wife. See *Shipp*, 52 Ill. App. 3d at 471-73 (discussing several violent incidents between the pair over their decade long relationship). In the incident leading to the victim's death, the victim had cornered defendant in a bedroom and continued to advance on her. *Id.* at 474. Defendant fired five shots and, at trial, was convicted of voluntary manslaughter.[2] *Id.* at 471. The question on appeal was whether the State had met its burden of disproving defendant's self-defense claim. *Id.* at 475. In reversing defendant's conviction, the court, relying heavily on the victim's violent history, concluded "the evidence will not support a finding, beyond a reasonable doubt, that the defendant continued to fire at the decedent after she reasonably should have realized that he was disabled." *Id.* at 477.

¶ 40        *Shipp* is legally and factually distinguishable. Unlike *Shipp*, the question on appeal in this case is whether the initial shot was justified so as to allow defendant to raise a claim of self-defense. There are also significant factual differences. Our victim and defendant had just encountered each other and did not have a decade-long violent relationship. Two witnesses testified to a pause in the fight and that the victim was not threatening after that point. These

_____

[2]Voluntary manslaughter no longer exists in Illinois and is now second degree murder. *People v. Jeffries*, 164 Ill. 2d 104, 111 (1995).

two witnesses also disagreed with the defendant and testified that the second shot occurred while Jones was on the ground and disabled. Given the legal and factual differences, *Shipp* provides no support for defendant's argument.

¶ 41 Given the similarities in their testimony, the trial court's reliance on the testimony of Melecio and Bias was not unreasonable. This testimony supported the trial court's finding that the defendant no longer faced the danger of imminent harm when he shot Jones. Accordingly, we affirm the trial court's ruling that the defendant failed to establish a required element of a self-defense claim.

¶ 42 In his second issue, defendant claims the trial court should have reduced both of his convictions because of the existence of a mitigating factors—an unreasonable belief in self-defense and serious provocation. Defendant argues the trial court erred when it found that he did not act with unreasonable belief in self-defense or that he acted under serious provocation in the murder of Jones. He further argues that the mitigating circumstances extended to the shooting of Bias. We take each argument in turn.

¶ 43 Second degree murder is a lesser mitigated, not a lesser included offense, of first degree murder. *People v. Jeffries*, 164 Ill. 2d 104, 122-23 (1995). A person commits the offense of second degree murder when he commits the offense of first degree murder as defined by paragraphs (1) or (2) of subsection (a) of section 9-1 of the Criminal Code of 2012 and either of the following mitigating factors is present:

> "(1) at the time of the killing he or she is acting under a sudden and intense passion resulting from serious provocation by the individual killed or another whom the offender endeavors to kill, but he or she negligently or accidentally causes the death of the individual killed; or
>
> (2) at the time of the killing he believes the circumstances to be such that, if they existed, would justify or exonerate the killing under the principles stated in Article 7 of this Code, but his or her belief is unreasonable." 720 ILCS 5/9-2(a)(1)-(2) (West 2016).

Whether defendant's actions were committed under either of the above mitigating circumstances is a question of fact for the trier of fact to resolve. *People v. Romero*, 387 Ill. App. 3d 954, 967-68 (2008). When reviewing a defendant's argument that he presented evidence to prove the existence of a mitigating factor, the reviewing court must consider "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the mitigating factors were not present." *People v. Blackwell*, 171 Ill. 2d 338, 358 (1996).

¶ 44 In reviewing the evidence in a light most favorable to the State, we cannot say the trial court erred in finding the defendant did not act with an unreasonable subjective belief that self-defense was justified. While the trial court heard evidence that Jones was the initial aggressor, the trial court also heard additional evidence from which it could reasonably conclude that the defendant shot Jones out of anger and revenge. The trial court accepted the testimony of both Melecio and Bias that after Melecio yelled at defendant and Jones to stop, the hostilities ceased. Melecio and Bias also testified that Jones did not make any threatening moves or statements after the fight ended. The trial court heard additional testimony that defendant then walked five to six car lengths away, bent down, retrieved the weapon, and returned to confront Jones. Bias alleged that defendant concealed the gun behind his back as he approached. Defendant then shot Jones in the head from close range. While defendant

testified the second shot occurred while Jones was coming at him, Melecio and Bias stated Jones fell to the ground after the first shot. Bias stated that Jones was on the ground when defendant fired a second shot to Jones's head. Defendant then admitted to fleeing the scene and discarding the weapon. Defendant admitted he did not seek medical attention for his injuries.

¶ 45 The trial court, sitting as the finder of fact, was free to reject, based on all the evidence it heard, defendant's argument that he subjectively believed he could fire on Jones in self-defense. Based on the record, we cannot say the evidence is so improbable or unsatisfactory that it will not support such a conclusion. Thus, we will not disturb the trial court's findings on review.

¶ 46 Alternatively, defendant argues his actions in the death of Jones were the result of a sudden and intense passion resulting from a serious provocation—Jones's initial attack on him. Illinois recognizes that only certain actions will rise to the level of "serious provocation": (1) substantial physical injury or substantial physical assault, (2) mutual quarrel or combat, (3) illegal arrest, and (4) adultery with the offender's spouse. *People v. Garcia*, 165 Ill. 2d 409, 429 (1995). The defendant must demonstrate both passion and serious provocation. *Id.* As stated previously, whether or not defendant's action was committed under mitigating circumstances is a question of fact. *Romero*, 387 Ill. App. 3d at 967-68.

¶ 47 After review of the record, a rational trier of fact could have concluded that defendant did not act based on a serious provocation resulting from a substantial physical injury or substantial physical assault. Illinois courts have previously stated that a claim of self-defense can negate an inference that a person acted under a sudden and intense passion. *People v. Clark*, 15 Ill. App. 3d 756, 759 (1973) (citing *People v. Smith*, 404 Ill. 350, 354 (1949)).

¶ 48 Defendant did not testify his actions were the result of a sudden and intense passion stemming from Jones's assault. Instead, defendant consistently claimed that his actions were in defense of himself and Melecio. Immediately after picking up the gun he had just hidden, defendant testified that he yelled for Jones to stop, and then proceeded to walk toward Jones because he was closing in on Melecio. The defendant then explained, "I got in between him and Efrain and told him to stop. I pointed my weapon and I said, Stop. And he didn't stop; he kept coming." Defendant then discharged one round into Jones's face and when Jones continued to advance, he fired again. He explained, "I didn't want to be there and stand there and watch my friend get beat probably to death." While defendant claimed he was injured, he admitted he did not seek medical attention and decided to go drinking after shooting Jones. We note the picture showing defendant's injury is not contained within the appellate record.

¶ 49 Based on the above, a trier of fact could conclude defendant was not acting under a sudden and intense passion. The trial court's conclusion the defendant's actions were deliberate, and not the result of a sudden impulse, is not unreasonable. His conviction for first degree murder in the shooting death of Charles Jones is affirmed.

¶ 50 We also reject defendant's argument that his attempted murder conviction should be reduced under either mitigating circumstance.[3] Defendant denied shooting Bias, and

[3]Defendant argues for a reduction in his attempted murder conviction, however, the applicable statute allows only for a reduction in sentence. See 720 ILCS 5/8-4 (West 2016) (stating that serious provocation will reduce the sentence from a Class X felony to a Class 1 felony); see also *People v.*

therefore cannot now claim that the shooting was the result of self-defense or serious provocation. Illinois courts have long held that " 'the theory under which a case is tried in the trial court cannot be changed on review.' " *People v. Hunt*, 234 Ill. 2d 49, 56 (2009) (quoting *In re Marriage Schneider*, 214 Ill. 2d 152, 172 (2005)). Because defendant denied shooting Bias at trial, he is now foreclosed from arguing that his shooting of Bias was the result of self-defense or sudden provocation. Accordingly, we affirm defendant's conviction for attempted first degree murder in the shooting of Bias.

¶ 51   Finally, defendant argues he was denied his sixth amendment right to effective assistance of trial counsel. He contends that his trial counsel failed to adequately argue for the affirmative defense of self-defense, mitigation to second degree murder, and reduction of his attempted first degree murder charge.

¶ 52   It is well-established that the sixth amendment right to counsel is the right to the effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). *Strickland* sets forth a two-prong test for ineffective assistance of counsel. *Id.* First, defendant must establish counsel's performance was deficient in that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* Second, if not for counsel's deficient performance, the outcome would have been different. *Id.* at 694. Illinois adopted the *Strickland* two-part test in *People v. Albanese*, 104 Ill. 2d 504 (1984). A defendant must succeed on both prongs in order to prevail on an ineffective assistance of counsel claim, but if the court determines defendant suffered no prejudice, trial counsel's performance becomes irrelevant. *People v. Coleman*, 183 Ill. 2d 366, 397-98 (1998).

¶ 53   We reject defendant's ineffective assistance of counsel claim because defendant has not satisfied the first prong of *Strickland*. The lack of a successful argument before the trial court does not automatically render counsel ineffective. *People v. Colley*, 173 Ill. App. 3d 798, 810 (1988). Defendant's argument is entirely rooted in his trial counsel's failure to obtain an acquittal based on self-defense, a reduction from first degree to second degree murder, and a reduction in the first degree attempted murder conviction. The trial court concluded defendant no longer faced an imminent threat of danger from Jones, and therefore could not claim self-defense. The trial court also rejected defendant's claim concerning the existence of mitigating factors. On appeal, he fails to identify any action or inaction on the part of his trial counsel in presenting these arguments below. The lack of a successful argument does not demonstrate that trial counsel was incompetent or ineffective, and we reject defendant's ineffective assistance of counsel claim.

¶ 54                                   CONCLUSION

¶ 55   For the foregoing reasons, we affirm defendant's conviction for first degree murder and attempted first degree murder.

¶ 56   Affirmed.

---

*Lopez*, 166 Ill. 2d 441, 451 (1995) (stating no crime of attempted second degree murder exists in Illinois).